UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| LA SIMPLE CO, LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 21-10058-LTS |
| SLP ENTERPRISES, LLC et al., | ) ) ) | |
| Defendants. | ) ) | |

ORDER ON PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING
ORDER AND A PRELIMINARY INJUNCTION (DOC. NO. 6)

April 27, 2021

SOROKIN, J.

This action arises from the termination of a business relationship between SLP Enterprises, LLC, a Massachusetts manufacturer, and La Simple Co, Ltd., the exclusive distributor of SLP's products in China until recently. La Simple has sued SLP, its chief executive officer, and the company that replaced La Simple as SLP's distributor in China, alleging breach of contract and a number of other claims under Massachusetts law.[1] Along with its complaint, La Simple filed a motion for injunctive relief. Doc. No. 6.[2] The defendants opposed the motion, Doc. Nos. 17, 18, and La Simple replied, Doc. No. 20. At the Court's request, La Simple then produced additional documents to support its motion, Doc. Nos. 22, 23, and the defendants responded in a surreply, Doc. No. 24. The Court heard oral argument on April 22, 2021. Doc. No. 27.

---

[1] The parties agree, and the relevant contract provides, that Massachusetts law governs here.
[2] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

I.     BACKGROUND

Based in Concord, Massachusetts, SLP makes sunglasses for children and, through two dozen distributors serving different geographic regions, sells its products worldwide. Doc. No. 1 ¶¶ 9, 14; Doc. No. 17-1 at 2-3. David Scheinberg owns and operates SLP. Doc. No. 1 ¶ 10; Doc. No. 17-1 at 2. In 2013, La Simple became the exclusive distributor of SLP's products in China and Hong Kong pursuant to a written distribution agreement with a three-year term. Doc. No. 17-1 at 3. La Simple and SLP continued this relationship with new three-year agreements commencing in 2016 and 2019. Doc. No. 1 ¶¶ 17-18; Doc. No. 17-1 at 3. The third agreement, executed in December 2018, is the contract at issue in this lawsuit ("the Distribution Agreement"). It contains the following relevant provisions:

> 4.3.   [La Simple] shall purchase from [SLP] a minimum level of the Products in accordance with the schedule annexed hereto as Schedule 2 (the "Minimum Purchase Requirements"). In the event [La Simple] fails to maintain these Minimum Purchase Requirements at any time, [SLP] shall have grounds to terminate this Agreement under Section 10 of this Agreement.
>
> *     *     *
>
> 10.1.   Unless sooner terminated as provided below, this Agreement shall be for a term of three (3) years.
>
> 10.2.   [SLP] may terminate this Agreement with 60 days notice upon the occurrence of the following:[3]
>
> 10.2.1. [La Simple]'s failure to maintain the Minimum Purchase Requirements required pursuant to Paragraph 4.3; [or]

---

[3] At the motion hearing, La Simple suggested that section 10 of the Distribution Agreement is ambiguous, and that the termination provisions in section 10.2 should be read as incorporating the opportunity to remedy a material breach described in section 10.3.1. See Doc. No. 1 at 34-35. The Court perceives no ambiguity. Section 10.2 addresses termination after breach of certain specific provisions and plainly provides no right to cure such breaches. The provision is unambiguous. There is simply no basis for importing a right expressly included in a distinct (and more general) section of the contract into a separate (and more specific) provision where the parties apparently elected not to include such a right.

\*        \*        \*

10.2.5. [La Simple]'s failure to meet the ordering schedule as outlined in Schedule 2.

\*        \*        \*

12.1.   None of the conditions or provisions of this Agreement shall be held to have been waived by any act of knowledge on the part of either party, except by an instrument in writing signed by a duly authorized officer or representative of such party.  Further, the waiver by either party of any right hereunder or the failure to enforce at any time any of the provisions of this Agreement, or any rights with respect thereto, shall not be deemed to be a waiver of any other rights hereunder or any breach or failure of performance by the other party.

\*        \*        \*

15.2.   Any subsequent amendments or modifications to this Agreement shall have no force or effect unless duly set forth in writing and signed by duly authorized representatives of the party or parties to be bound thereby.

\*        \*        \*

18.1   No failure or omission by either of the parties hereto in the performance of any obligation of this Agreement shall be deemed a breach of this Agreement nor create any liability if the same shall arise from any cause or causes beyond the control of the party affected, including, but not limited to, the following, which, for the purposes of this Agreement, shall be regarded as beyond the control of the party in question ("Force Majeure"):  Acts of God, acts or omissions of any Government or any agency thereof; compliance with requests, recommendations, rules, regulations, or orders of any government authority or any officer, department, agency, or instrumentality thereof; fire, storm, flood, earthquake, acts of the public enemy, war, rebellion, riots, invasion, strikes, or lockouts.  During any such case of Force Majeure, the Agreement shall not be terminated, but only suspended, and the party affected shall continue to perform its obligations to the extent possible and resume the performance of its suspended obligations as soon as such case of Force Majeure is removed or alleviated.

Doc. No. 1 at 29-37.

Schedule 2 to the Distribution Agreement set Minimum Purchase Requirements, or "quotas," for 2019, 2020, and 2021 ($500,000, $550,000, and $600,000, respectively).  Id. at 43. It also set an order schedule requiring La Simple to fulfill 25% of its quota for a given year "on or before March 31," 50% "on or before May 31," 80% "on or before July 31," and all of the

quota "on or before September 30." Id.  According to Scheinberg, such a schedule had not been included in the two prior agreements between SLP and La Simple.  Doc. No. 17-1 at 3-4.  It was added to the Distribution Agreement because, during the term of the parties' prior agreement, La Simple had made "large purchases in the last quarter of each calendar year in order to meet its annual quota," a practice Scheinberg wished to stop because it "resulted in SLP making deliveries of large quantities of product in the next calendar year and, he believed, "impact[ed] La Simple's ability to make the [quotas] for the next calendar year." Id.

In 2019, La Simple had not met its quota by the September 30 deadline required under the Distribution Agreement.[4]  Id. at 4; accord Doc. No. 6-3 at 14.  SLP agreed to extend La Simple's deadline to the end of that calendar year, apparently via an oral agreement (or, at least, without a formal written modification as the Distribution Agreement requires).  Doc. No. 17-1 at 4; accord Doc. No. 6-3 at 14.  According to Scheinberg, issues arose around the same time regarding La Simple's failure to pay for its 2019 purchases in accordance with the Distribution Agreement, and another accommodation was made, "extending the payment terms . . . with interest."  Doc. No. 17-1 at 5; see id. at 8 (reflecting Scheinberg raised concerns about La Simple's failure to adhere to the Distribution Agreement via a March 23, 2020 email); see also Doc. No. 1 at 54 (referencing a "productive call" in April 2020 regarding "a plan to fix the previous payment issue").

The record before the Court reflects that the COVID-19 pandemic understandably impacted various aspects of La Simple's business, and that representatives of La Simple raised

---

[4] Indeed, according to Scheinberg's description, La Simple had not met the July 31 deadline in 2019 either.  See Doc. No. 17-1 at 4 (stating that La Simple had purchased only $335,000 of product, or about 67% of the $500,000 quota, by September 30, 2019, despite the schedule requiring that 80% of the quota be fulfilled by July 31).

concerns about the pandemic's effects on the company's ability to satisfy its 2020 quota in conversations with Scheinberg.  Doc. No. 6-3 at 2-3; accord Doc. No. 1 at 49, 54.  Nevertheless, La Simple satisfied the first two deadlines (March 31 and May 31) under Schedule 2 to the Distribution Agreement in 2020.  Doc. No. 17-1 at 5.  It also apparently participated in trade shows in China, at which it marketed SLP's products, in June and October 2020.  See Doc. No. 1 at 49 (describing a "6/18 event"); Doc. No. 6-3 at 5 (describing October event at which "La Simple's China team . . . presented SLP's products to customers and clients").  The parties agree that La Simple failed to meet the July 31 and September 30 deadlines in 2020; they disagree whether this amounted to a breach of the Distribution Agreement.

      According to La Simple, SLP (through Scheinberg) agreed during a phone call at the end of June 2020 that the quota for that year would be suspended due to the pandemic, with the Distribution Agreement's requirements to resume in 2021.  Doc. No. 6-3 at 3-4, 12-13.  In La Simple's view, this conversation effected an oral modification of the Distribution Agreement, and it proceeded according to that modification for the remainder of 2020.  According to SLP, it never agreed to such a modification, the terms of the Distribution Agreement remained in effect, and its decision to terminate the relationship resulted from La Simple's failure to satisfy the 2020 quota.  Doc. No. 17-1 at 5.  SLP notified La Simple in writing that it was terminating the Distribution Agreement on November 23, 2020, effective January 22, 2021 (after the sixty-day period provided in the relevant contract provision).  Doc. No. 1 at 51.

      Around the same time, SLP entered a new agreement making La Simple's competitor, Western Baby Distribution, Inc., SLP's exclusive distributor in China, Hong Kong, and Macau.  Doc. No. 17-1 at 15-17.  La Simple vigorously contends that SLP established this new relationship before it had terminated the Distribution Agreement, citing information it received

from a client in China.  See Doc. No. 23 at 4 (providing a copy of a document titled "Exclusive Distributor Authorization (January 01, 2021 to December 31, 2022)" and dated November 20, 2020 that La Simple received from a customer in December 2020).  According to La Simple, this sequence of events demonstrates SLP's bad faith and suggests its decision to replace La Simple was not motivated by La Simple's failure to fulfill its 2020 quota.

SLP denies this, explaining that the November 2020 document La Simple obtained functioned as an expression of intent—if an inartful one—by SLP and Western Baby indicating their interest in doing business with one another, and that the document was neither filed with any agency nor accompanied by a contemporaneous distribution agreement.  Doc. No. 24-1 at 1-2.  According to SLP, its formal relationship with Western Baby was established in a contract dated December 15, 2020 granting Western Baby exclusive distribution rights effective January 23, 2021.  Doc. No. 17-1 at 15-17; accord Doc. No. 17-2 at 3, 6-8.  That contract was accompanied by a second "Exclusive Distributor Authorization" reflecting modified dates and bearing an official stamp that, SLP says, demonstrates it was the official version of that document intended for filing with trade agencies in China.  Doc. No. 24-1 at 2; compare Doc. No. 23 at 4 (stating authorization would begin January 1, 2021 in unstamped authorization dated November 20, 2020), with Doc. No. 24-2 at 1 (specifying authorization began January 23, 2021 and bearing stamp beside signature on behalf of Western Baby in authorization dated December 15, 2020).  In addition, Western Baby avers that it took no orders for SLP products before January 23, 2021, it had not yet shipped any of SLP's product to China as of March 12, 2021, and it never knowingly contacted any of La Simple's customers.  Id. at 3-4.

II.     DISCUSSION

The familiar standard governs La Simple's motion for injunctive relief.  A court assessing such a request "must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest."  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).  La Simple "bears the burden of establishing that these four factors weigh in its favor."  Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).  A "preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs."  CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 620 (1st Cir. 1995).  Where a party requests an order that would compel action by the other party and "disturb rather than preserve the status quo," the motion is one for a mandatory preliminary injunction and is appropriately "granted only in those circumstances when the exigencies of the situation demand such relief."  Lewis v. Gen. Elec. Co., 37 F. Supp. 2d 55, 62 (D. Mass. 1999).  Because such injunctions are "disfavor[ed]," the moving party must make an even stronger showing of entitlement to relief than is typically required.  Id. at 62-63.

For present purposes, the Court need only discuss the first two factors, neither of which are satisfied.  "The sine qua non of [the preliminary injunction] inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity."  New Comm Wireless Servs., Inc. v.

7

SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). Likewise, "[i]n most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004). To establish irreparable harm, La Simple must point to "a substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000). "[I]f money damages will fully alleviate harm, then the harm cannot be said to be irreparable." K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989).

    A.    Likelihood of Success

In the Complaint, La Simple asserts seven claims: breach of contract, breach of the covenant of good faith and fair dealing, fraudulent misrepresentation, promissory estoppel, intentional interference with contractual and advantageous business relationships, a violation of Chapter 93A of the Massachusetts General Laws, and a request for declaratory relief and specific performance.[5] Doc. No. 1 ¶¶ 74-127. Because the success of each claim depends, at least in part, on La Simple's ability to demonstrate that the Distribution Agreement was suspended in 2020 as it alleges, the Court focuses its evaluation of La Simple's likelihood of success on the merits on that question.

Under the plain language of the Distribution Agreement, La Simple's failure to satisfy the July and September deadlines set in Schedule 2 and/or to fulfill its 2020 quota at all permitted SLP to terminate the agreement with sixty days' notice. Thus, La Simple's claim that SLP breached the contract depends on one of two theories: 1) that the Distribution Agreement was

---

[5] All claims are alleged against SLP. The fraudulent misrepresentation claim is asserted against SLP and Scheinberg. The intentional interference and Chapter 93A claims are asserted against SLP and Western Baby.

8

validly modified in June 2020 such that La Simple's remaining obligations for that year were suspended; or 2) that the Force Majeure clause of the contract was triggered by the COVID-19 pandemic such that La Simple's obligations were suspended and its failure to satisfy the 2020 quota on the specified schedule was excused.  After careful review, the Court finds that La Simple has not established it is likely to succeed in proving either of these theories.

First, the Distribution Agreement contains both an integration clause and language requiring any modifications to be "duly set forth in writing and signed by duly authorized representatives of the party or parties to be bound thereby."  Doc. No. 1 at 36.  Though these provisions do "not necessarily bar oral modification" of the Distribution Agreement, "evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties."  Cambridgeport Sav. Bank v. Boersner, 597 N.E.2d 1017, 1022 & n.10 (Mass. 1992).[6]  The record here does not contain such evidence.  La Simple's two representatives have submitted affidavits, each including an identical quote of what they contend Scheinberg said during the critical conversation.  Doc. No. 6-3 at 4, 13; accord Doc. No. 1 at 7.  Scheinberg, however, has twice denied having made the relevant statement.  Doc. No. 16 at 4; Doc. No. 17-1 at 5.  In other words, the only direct evidence La Simple has offered in this regard is unequivocally contradicted by the defendants' responsive evidence.  And, the circumstantial

---

[6] In explaining this principle, the Supreme Judicial Court ("SJC") cited an earlier case in which the evidence supporting an oral modification in the face of a provision requiring a writing "included numerous discussions between the parties and written communications setting forth the details of the new agreement and directing that the appropriate legal documentation be prepared."  Cambridgeport Sav. Bank, 497 N.E.2d at 1022 (discussing First Pa. Mortg. Trust v. Dorchester Sav. Bank, 481 N.E.2d 1132 (Mass. 1985)).  Such evidence, the SJC explained, demonstrated that the party denying the modification had previously "'unequivocally' expressed his approval 'of the many pertinent details' of the new agreement."  Id.

evidence in the record is simply not strong enough to overcome the presumption arising from the plain language of the Distribution Agreement.

Though La Simple contends the conversation giving rise to the modification occurred on June 29, 2020, Doc. No. 1 ¶¶ 33-35, it has submitted as exhibits written communications between the parties that create doubt as to when (and whether) this crucial conversation took place.  An email dated June 30, 2020 from a La Simple representative to Scheinberg appears to list topics for discussion at a "monthly call" that had not yet occurred.  Doc. No. 1 at 49.  It references the pandemic and includes the following statements by the La Simple representative: "Regarding to the quota 2020, we believe the best we can do is 60%-65% of the preset quota. . . . If China got the Covid-19 situation under control again soon, we believe we can resume to the 550K quota for year 2021."  Id.  It in no way states or implies that a conversation—let alone an oral modification of the Distribution Agreement—occurred the previous day.[7]  The next relevant document is an email from La Simple's chief executive officer sent to Scheinberg more than three weeks after SLP notified La Simple it was terminating the Distribution Agreement (and less than a month before this lawsuit was filed).  Id. at 51, 54.  In it, the CEO described "the critical call" as having occurred "on May 29th 2020," and as having included an agreement to suspend the quota while requiring La Simple to make its "best effort" during the remainder of 2020.  Id. at 54.  Days later, Scheinberg wrote back and denied having agreed to suspend the 2020 quota, citing the Distribution Agreement's provision requiring that modifications occur in writing.  Id. at 57.

---

[7] To the extent La Simple suggested (for the first time) during the motion hearing that there were actually two telephone calls in June—one on the 29th before this email was written, and another on the 30th after the email was sent—the fact remains that the June 30 email contains absolutely no language memorializing or otherwise referencing a recent conversation in which a material term of the Distribution Agreement was modified or suspended by agreement of the parties.

In other words, La Simple has offered no contemporaneous communications confirming its assertion that the contract was modified orally, or reflecting any statement by Scheinberg or anyone else representing SLP adopting or approving of the modification La Simple now describes. Rather, the communications before the Court either undermine the timing described by La Simple, are silent as to the terms of a crucial agreement to modify the contract, or reflect SLP's express denial of such a modification. None of this evidence is "of sufficient force" to find that SLP made, and then breached, an oral modification of the "integrated and complete" Distribution Agreement, "which requires written consent to modification." Cambridgeport Sav. Bank, 497 N.E.2d at 1022.

La Simple's effort to establish an oral modification of the Distribution Agreement is not meaningfully aided by evidence that SLP orally agreed to extensions of its purchasing and payment obligations in 2019. SLP agrees it permitted such modifications then, and it has offered a March 2020 email from Scheinberg to La Simple's representatives confirming that it had accommodated La Simple's requested "concessions." Doc. No. 17-1 at 4-5, 8. On this record, the Court finds that the parties' modification in this prior instance—and the email reflecting Scheinberg's "frustrat[ion]" resulting from La Simple's conduct—is at least as likely to support a finding that SLP was not inclined to continue accommodating such requests from La Simple and was growing impatient with its performance (thus lending credence to its stated reason for terminating the relationship in accordance with the contract) as it is to provide a basis for finding that an oral modification occurred in June 2020.[8] Finally, La Simple's position also derives little

---

[8] In addition, the defendants represented to the Court during the motion hearing that they had recently located emails from September 2019 memorializing—and reflecting both parties' assent to—the prior modification of the Distribution Agreement. Those documents are not presently in the record and need not be, because they would not alter the Court's resolution of the pending motion. However, assuming they exist and are consistent with defense counsel's description of

11

support from the fact that SLP waited until November to terminate the relationship, rather than doing so immediately upon La Simple's failure to satisfy its July or September deadlines.  The contract itself does not require immediate action in response to a material breach; indeed, it expressly provides otherwise.  <u>See</u> Doc. No. 1 at 35 (specifying that "the failure to enforce at any time . . . any rights" under the contract "shall not be deemed to be a waiver of . . . any breach or failure of performance of the other party").

In sum, there is a dearth of evidence supporting La Simple's claim that it is likely to succeed in establishing that SLP made, and then breached, an oral modification of the Distribution Agreement.

<u>Second</u>, La Simple invokes the Distribution Agreement's Force Majeure clause as an alternative basis for asserting SLP breached the contract.  It claims that the clause, which would suspend its obligation to meet the 2020 quota, was triggered by COVID-19 (an "Act[] of God" and, thus, a "cause . . . beyond the control of" La Simple).  Considering this express contract provision and the unprecedented nature of the COVID-19 pandemic, the Court views this as the far more tenable basis for La Simple's claims in this action.  However, even if the Force Majeure clause is logically implicated here, the burden remains with La Simple to establish a likelihood that it will succeed in proving all of the terms of the clause are satisfied.  Besides a handful of general statements in affidavits by two of its representatives regarding the pandemic's impact on travel, manufacturing, and demand for sunglasses, Doc. No. 6-3 at 2-3, 12-13, La Simple has

---

them, they will further and substantially undermine La Simple's reliance on the 2019 events as support for its contention that the contract was orally modified in June 2020.

offered no evidence showing in any detail when and how its ability to satisfy the relevant quota was impacted.[9]

Thus, even "assuming *arguendo* that the pandemic and [its] effects . . . are a force majeure under the [Distribution] Agreement," La Simple "has not shown that its failure to perform its obligations" was "caused by" the pandemic as required by the language of the Force Majeure clause, Future St. Ltd. v. Big Belly Solar, LLC, No. 20-cv-11020-DJC, 2020 WL 4431764, at *6 (D. Mass. July 31, 2020), nor has it demonstrated it "continue[d] to perform its obligations to the extent possible" throughout 2020, Doc. No. 1 at 36-37.[10]  This is especially true where the record reflects that La Simple was failing to satisfy its obligations under the Distribution Agreement even before the pandemic (i.e., in 2019), and where La Simple's own exhibits reflect that it had a team of employees based in China through which it continued to "generate[] lots of interest and attention" and "move plenty of" SLP's products through the summer and fall of 2020.  Doc. No. 1 at 49, 54; Doc. No. 6-3 at 5.

In these circumstances, the Court concludes that La Simple has not adduced sufficient evidence to establish that it is reasonably likely to succeed on its claims insofar as they are premised on an assertion that the failure to satisfy its contractual obligations in 2020 was excused under the Force Majeure clause of the Distribution Agreement.

La Simple's failure to establish a likelihood that it will prove either a valid oral modification of the Distribution Agreement or application of the Force Majeure clause means it

---

[9] The communications before the Court that might have included such information are silent on this subject.  See Doc. No. 1 at 49 (mentioning no problems with shipping, transportation, or other business logistics); id. at 54 (describing no logistical or other specific problems arising from the pandemic that prevented satisfaction of the 2020 quota).

[10] At least one communication before the Court might be read to suggest otherwise.  See Doc. No. 1 at 54 (suggesting La Simple did not meet the 2020 quota because it relied on the alleged modification, and that otherwise it "would have made ALL EFFORTS" to meet the quota).

has not established it is likely to succeed on any of its contract-based or quasi-contract claims (Counts I, II, IV, and VII of the Complaint), nor any of the remaining claims which depend on proving that SLP agreed to modify La Simple's quota for 2020 (Counts III and VI, at least in part). As to the remaining claims, the defendants have correctly identified legal hurdles La Simple cannot surmount here. See Doc. No. 17 at 10-13 (noting intentional interference requires proof of an improper motive or means and that competition for customers or business is insufficient, a party to a contract cannot interfere with its own contract, and breach of contract cannot ground Chapter 93A claim without additional evidence of unfairness arising from acts undertaken in Massachusetts).

Accordingly, La Simple has not satisfied the first—and most important—element of the test governing the availability of the "extraordinary and drastic remedy" it seeks. Munaf v. Geren, 553 U.S. 674, 689 (2008) (quotation marks omitted).

    B.    Irreparable Harm

Besides failing to establish a likelihood of succeeding on any of its claims, La Simple also has not shown that it will be irreparably harm such that injunctive relief is warranted. Though it has identified a number of ways in which it alleges the defendants' conduct has or will harm it, nearly all are essentially pecuniary injuries. See Doc. No. 6-1 at 12-14 (listing unsold SLP products in warehouses in China, prepaid shipping and other related fees, inability to achieve a specified sales goal, actual and potential requests by customers to be refunded for or to buy back SLP products in their warehouses, an outstanding balance on a business loan, and loss of significant revenue); Doc. No. 6-3 at 6-9 (same). Those that are not obviously remediable via monetary damages are vague and speculative assertions of harm La Simple fears might occur in the future. See Doc. No. 6-1 at 12-14 (asserting Western Baby "will now be in a position to take

over [a] mature and successful market" La Simple developed but also stating that La Simple's "largest accounts in China . . . do not wish to work with Western Baby," and summarily claiming La Simple might be put "out of business," "has already been forced to lay off employees," and "its reputation will likely have been so badly damaged that it will not be able to do business with [its China] customers again"); Doc. No. 6-3 at 6-9 (same).

On this record, the Court finds La Simple's assertions of harm are either based on "conjecture, surmise, or" its "unsubstantiated fears of what the future may have in store," or they are injuries for which La Simple has an "adequate remedy at law." Charlesbank Equity Fund, 370 F.3d at 162.  The Court also notes that La Simple's "cries of urgency are sharply undercut by its own rather leisurely approach to the question of preliminary injunctive relief." Id. at 163.  It appears from the present record that La Simple waited nearly a month before protesting to SLP after being notified that the Distribution Agreement was to be terminated, then waited several more weeks before filing this action.  It then sought a schedule and assented to an extension thereof which meant that its request for injunctive relief would not be fully briefed and ripe for resolution until more than two months after the filing of the Complaint.  Doc. Nos. 8, 12.  As the First Circuit has observed, such accumulated delay "detracts from [La Simple's] claim of irreparable harm."  Id. at 163.[11]

---

[11] The accumulated delay also complicates the question of what "status quo" the Court is asked to preserve.  Even under the briefing schedule originally proposed by La Simple—before it was extended with La Simple's assent—the motion for injunctive relief would not have been ripe for the Court's consideration until several weeks after the sixty-day termination period had expired and SLP's new agreement with Western Baby (executed a month before this lawsuit was filed) had taken effect.  This sequence underscores the extraordinary nature of La Simple's request, which seeks far more than the "freezing" of "an existing situation." Lewis, 37 F. Supp. 2d at 62.

III.    CONCLUSION

"A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests. The instant record reflects no basis for a reasoned belief that such an order is necessary." Id. Accordingly, the motion for injunctive relief (Doc. No. 6) is DENIED.

                              SO ORDERED.

                              /s/ Leo T. Sorokin
                              United States District Judge